* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and receive further evidence. Plaintiff filed a motion with the Full Commission seeking to re-open the record to depose Dr. Furr and Stephanie Mackey. On October 24, 2006, the Full Commission granted plaintiff's motion and reopened the record for the additional depositions. Dr. Furr's deposition transcript was received into evidence, along with two additional records from his office chart. After the parties were granted an extension of time to file supplemental briefs, defendant timely submitted its supplemental brief to the Commission on February 2, 2007. After the close of business hours on February 2, 2007, plaintiff sought an additional extension of time to file her supplemental brief. Based upon the record of evidence before the Commission and the numerous extensions of time already granted the parties, the Commission HEREBY DENIES plaintiff's motion. The record is now closed and the matter is ready for decision.
Upon reconsideration of the evidence of record, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the parties and the subject matter.
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. An employee-employer relationship existed between plaintiff and defendant on January 24, 2002 and April 4, 2002.
4. At all relevant times, defendant was a qualified self-insured under the terms and provisions of the Act.
5. Plaintiff's average weekly wage was $347.94, yielding a compensation rate of $231.97 per week.
6. A notebook of medical records and documentary evidence was introduced into evidence as Stipulated Exhibits 1 through 9.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 37 years old. Plaintiff has a high school diploma and a Nursing Assistant Certification (CNA). Since graduating from high school, plaintiff has worked in various CNA jobs and at Adams-Millis folding socks.
2. Plaintiff began working for defendant as a CNA in May 2001. Plaintiff worked on the 19-bed Renal Unit known as Eight North. Plaintiff was hired to work three 12-hour shifts per week on Eight North.
3. Plaintiff testified that during two of her three shifts each week, she was the only CNA on Eight North. On those days, plaintiff was required to perform CNA duties for every patient on the unit. Plaintiff testified that on her shifts, she bathed every patient, and dragged two to three bags of laundry from each room to a laundry chute. She also took four to five patients per day to dialysis in beds that were difficult to maneuver. Plaintiff alleges that these activities placed great stress on her hands.
4. Plaintiff testified that on or around January 24, 2002, she was lifting a laundry bag into the Eight North laundry chute when she experienced neck pain that shot down her arms into her hands.
5. Plaintiff had attendance problems dating back to October of 2001. On February 1, 2002, plaintiff received an oral attendance warning, which documented an additional five absences and 17 tardies. Plaintiff was informed by Rebecca Redmond, her supervisor, that additional absences would result in a written reprimand.
6. Prior to receiving this warning, on Sunday, January 28, 2002, plaintiff went to the emergency room with complaints of an elevated heart rate, dizziness, numbness and weakness in her legs, and tingling in her fingers. Plaintiff was diagnosed with tachycardia, paresthesia and hypokalemia. Her treating physician requested plaintiff work eight-hour shifts until further examination was completed.
7. In late February 2002, plaintiff returned to see her physician with complaints of tingling and numbness in her hands. Dr. William Folds referred plaintiff to Dr. Frank Crowell for nerve conduction studies. The studies were normal and Dr. Folds referred her to Dr. Gregory Holthusen, an orthopaedic surgeon, for further evaluation.
8. At her appointment on March 5, 2002 with Dr. Holthusen, plaintiff reported that over the past several months she experienced persistent pain in her forearms and tingling in her hands. Although she complained that work made her pain worse, Dr. Holthusen noted that plaintiff did not have a repetitive job. Plaintiff recalled no specific injuries and was suffering no neck pain. Plaintiff made no mention to Dr. Holthusen about the alleged laundry incident during this appointment or throughout her course of treatment with him. Dr. Holthusen diagnosed plaintiff with carpal tunnel syndrome and restricted her to working eight-hour shifts.
9. On March 6, 2002, plaintiff received an oral warning from Ms. Redmond regarding failing to document patients' vital signs and perform daily weights. The warning indicated that if plaintiff did not improve her performance in these areas, a written reprimand would follow.
10. On March 21, 2002, plaintiff received a written attendance reprimand which noted that she had missed three days of work since her last warning. Plaintiff was notified that another absence or tardy before June 1, 2002, would result in her being placed on probation and that continued absences could result in termination.
11. On or about March 25, 2002, plaintiff approached Assistant Director of Nursing, Debra Harding, about the reprimand. Ms. Harding explained that if the illness was recurrent or affecting plaintiff's attendance, plaintiff should file papers for FMLA leave.
12. On March 26, 2002, plaintiff returned to Dr. Holthusen, with ongoing complaints about her wrists. Dr. Holthusen recommended that plaintiff undergo a left carpal tunnel release to be scheduled at plaintiff's convenience.
13. On March 27, 2002, plaintiff called Brad Bell in Risk Management, inquiring anonymously at first about whether "tendonitis" was covered by workers' compensation. Mr. Bell explained that many things can cause such a condition and that if she thought she had been injured on the job, she needed to report the injury to a supervisor and fill out an occurrence report. On March 28, 2002, plaintiff filled out the report, writing that she "went to the doctor on 1/29/02. My hands keep get [sic] weak and pain in hands and shoulders and arms." Plaintiff did not describe a laundry incident on the occurrence report.
14. Ms. Harding was surprised by the timing of the report, which was only days after their conversation regarding attendance, and discussed the issue with plaintiff. Plaintiff told Ms. Harding that she had talked to Mr. Bell about whether her condition might be related to workers' compensation because she could not afford to be out of work after her surgery.
15. On April 2, 2002, plaintiff told Mr. Bell that she had filed an occurrence report, and he instructed her to go to employee health for an examination. On the morning of April 3, 2002, plaintiff reported to employee health and saw Janet Snipes, R.N. Plaintiff reported having bilateral hand and back pain since January 2002.
16. On April 3, 2002, plaintiff went to see Mr. Bell, who then took plaintiff's recorded statement. For the first time, plaintiff described a laundry incident, stating that she experienced a sharp pain in both shoulders while working with laundry bags in January 2002. Plaintiff had not mentioned or reported the alleged January laundry incident until this conversation. The Full Commission finds that, in view of plaintiff's failure to report the alleged incident to her supervisors or physicians and her history of warnings and statements to Mr. Bell and Ms. Harding, plaintiff's allegations that an incident occurred in January 2002 are not credible.
17. On April 4, 2002, plaintiff saw Wayne VonSeggen, PA-C in employee health and recounted experiencing upper back pain when taking laundry bags to the chute on January 26, 2002. Plaintiff claimed that later in the day on January 26, 2002, she experienced numbness going into her fingers. Mr. VonSeggen suspected plaintiff's complaints might be related to cervical radiculopathy and took plaintiff to see Mr. Bell.
18. In Mr. Bell's presence, Mr. VonSeggen suggested that plaintiff follow up with her personal physician and orthopedist regarding further evaluation of her complaints. Mr. VonSeggen also arranged with Mr. Bell for plaintiff to be scheduled for an MRI, which was set for April 8, 2002. Mr. VonSeggen advised plaintiff to postpone her surgery, pending the MRI results. It was further agreed that plaintiff could return to work with a 30-pound lifting restriction, until further evaluation of her neck was completed. The Commission finds that plaintiff presented no credible evidence that Mr. Bell and Mr. VonSeggen engaged in prohibitedex parte communications.
19. Plaintiff last worked for defendant on April 4, 2002. After undergoing the MRI in the morning, plaintiff returned to see Mr. VonSeggen on April 8, 2002, stating that she did not feel she could return to work. Mr. VonSeggen declined to write plaintiff out of work, but continued the lifting restriction pending review of the MRI results, which showed no abnormality. Plaintiff did not see Mr. VonSeggen after this date.
20. Plaintiff's official leave of absence began on April 4, 2002. However, the leave of absence provider certification form completed by Dr. Holthusen's office was not completed until April 25, 2002. According to the testimony of Ms. Harding and Ms. Redmond, they had great difficulty getting the required paperwork from plaintiff after she went out on leave.
21. On April 15, 2002, Mr. Bell called plaintiff to inform her that defendant was denying her workers' compensation claim. On April 17, 2002, defendant filed a Form 61 denying plaintiff's claim.
22. On May 6, 2002, Dr. Holthusen performed a left carpal tunnel release. Plaintiff's leave of absence papers noted that she would be out of work for approximately four weeks from the date of surgery. Plaintiff's position on Eight North was held open for her return.
23. Ms. Harding testified that after plaintiff went out on leave of absence, plaintiff made no contact with her to discuss returning to work. On June 6, 2004, after leaving plaintiff three telephone messages and receiving no return calls, Ms. Harding mailed plaintiff a letter requesting that plaintiff contact her by June 20, 2002 to discuss returning to work. Ms. Harding did not hear from plaintiff, and, on June 27, 2002, mailed her a second letter, notifying plaintiff that her position would be filled. Ms. Harding told plaintiff to contact her if plaintiff needed an extension of the leave of absence. A second identical letter was mailed on July 10, 2002. Plaintiff's position was ultimately filled prior to July 31, 2002.
24. On July 31, 2002, Dr. Holthusen released plaintiff to return to CNA work without restrictions. Plaintiff applied for two CNA transfer positions with defendant in 2002, but she was unsuccessful.
25. On November 19, 2002, plaintiff returned to Dr. Holthusen complaining of recent left shoulder pain, which Dr. Holthusen diagnosed and treated as subacromial bursitis. Dr. Holthusen did not believe that the bursitis was related to any injury occurring in January 2002. At this visit, plaintiff had no pain in her left hand and had full use of her left hand.
26. On January 8, 2003, plaintiff saw Dr. Holthusen and complained of numbness and tingling in her right wrist. A right carpal tunnel release was performed on February 10, 2003. Plaintiff was again released to return to CNA work without restriction on May 5, 2003.
27. On May 5, 2003, plaintiff began unrestricted CNA work, taking a home healthcare position with Fairway Home Care. Plaintiff earned $7.00 per hour between May and August 2003.
28. Plaintiff returned to Dr. Holthusen on May 13, 2003, complaining of weakness in her arms, left shoulder pain, and for the first time, neck pain. Cervical x-rays were normal and Dr. Holthusen did not give plaintiff restrictions.
29. The Full Commission finds that plaintiff had no work restrictions between May 2003 and August 2003. Plaintiff stopped working at Fairway Home Care in August 2003, claiming that the work was too painful and she could not perform it anymore. Plaintiff's testimony that she quit for these reasons is not credible or supported by the evidence.
30. On December 17, 2003, Dr. Holthusen noted that plaintiff's hands were much improved and that "most of her problems are now coming from her neck." An MRI was normal and plaintiff was sent to physical therapy to address her neck pain.
31. Plaintiff returned to Dr. Holthusen again on March 8, 2004, stating that her neck and hand symptoms were much improved. She complained of left leg numbness, paresthesias and buttock pain. Dr. Holthusen noted that plaintiff had prior low back problems and took x-rays, which showed significant L5-S1 narrowing. Dr. Holthusen believed the narrowing at L5-S1 was the source of plaintiff's neck symptoms.
32. On April 1, 2004, plaintiff saw Dr. David DuPuy and Dr. Warren Burrows for independent medical examinations. Both doctors believed plaintiff was capable of working and that further surgical intervention or medical treatment was unwarranted.
33. Dr. Burrows gave plaintiff a five percent permanent impairment rating to each hand. Based on plaintiff's subjective complaints of weakness, Dr. Burrows believed 25 pound lifting restrictions might be appropriate for plaintiff, but that a functional capacity evaluation could determine this precisely. Dr. DuPuy opined that plaintiff did not require any restrictions.
34. Both Dr. Burrows and Dr. DuPuy did not believe that plaintiff's carpal tunnel syndrome was caused by her employment as a CNA or that her employment as a CNA placed her at an increased risk of developing carpal tunnel. The Full Commission finds that the greater weight of the medical evidence supports their opinions.
35. Plaintiff last visit with Dr. Holthusen was April 28, 2004. Her back symptoms had cleared, but she reported pain and weakness in her hands. Plaintiff showed no signs of recurrent carpal tunnel syndrome. However, Dr. Holthusen recommended that plaintiff not lift over 10 pounds and that she attend vocational rehabilitation. There is no evidence plaintiff attended vocational rehabilitation. Dr. Holthusen stated that he does not know if plaintiff still requires these restrictions or if she is even currently symptomatic.
36. During Dr. Holthusen's deposition, plaintiff's counsel presented the description of her job duties as plaintiff testified at the hearing. Dr. Holthusen was told that plaintiff worked her position on Eight North for three years, that she carried three to four bags of "generally wet" laundry from every room each shift, and that she worked alone two out of three days per week. Dr. Holthusen testified that plaintiff described a job that would put stress on her wrists and hands; however, his opinion was based upon an inaccurate job description. Dr. Holthusen opined that if plaintiff did not work alone two out of three days per week, she was much less likely to increase her risk of carpal tunnel syndrome.
37. Dr. Holthusen further testified that although plaintiff described a job that would put stress on her wrists and hands, he did not often see a CNA type job cause carpal tunnel syndrome. Dr. Holthusen found it doubtful that the laundry incident would have caused plaintiff's neck and shoulder symptoms. Overall, Dr. Holthusen's testimony fails to support plaintiff's claim that her carpal tunnel syndrome or other arm and neck complaints were caused by her employment with defendant.
38. Plaintiff's testimony at the Deputy Commissioner's hearing regarding her job duties was contradicted by the testimony of Debra Harding and Rebecca Redmond. The Commission finds that plaintiff's claim that she worked two out of three days per week as the only CNA on Eight North and that she carried two to three laundry bags from each room to the laundry chute per day is not credible. In addition, the evidence does not support plaintiff's testimony that the laundry was "wet." Plaintiff's claims that she provided total care for all patients on Eight North and bathed each patient on her shift are also found not to be credible.
39. On April 2, 2004, plaintiff was observed by private investigator Charlie Earp inside Stephanie's Hair Salon in Winston-Salem for six hours. During his days of observation in early April 2002, Mr. Earp saw plaintiff spend hours at Stephanie's, wearing a beautician's cape, washing hair, answering phones and with scissors in her hands. Mr. Earp's observations strongly indicate that plaintiff was working as a hair stylist on these days.
40. Plaintiff testified that she was at Stephanie's Hair Salon for three to four hours in the days before the Deputy Commissioner's hearing. Plaintiff admitted to being frequently present at the salon in April 2004 and until the time of the Deputy Commissioner's hearing, but denied that she worked there. The Full Commission finds that Mr. Earp's testimony is credible and that plaintiff's denial that she was working at the hair salon is not credible.
41. Plaintiff did not have restrictions to her hands or any part of her body from August 3, 2002 through April 28, 2004.
42. On June 3, 2004, plaintiff went to Centralina Orthopaedic and Sports Medicine for a second opinion. Plaintiff saw Kris Watson, physician's assistant for Dr. W. Stephen Furr, orthopedist. Plaintiff gave a history of bilateral hand and neck pain related to her old job as a CNA, but recalled no specific injury. Mr. Watson recommended a cervical MRI and repeat EMGs for diagnostic purposes. Plaintiff did not return for these tests or has not sought treatment after this time.
43. At his deposition, Dr. Furr testified plaintiff's neck symptoms might have occurred when she lifted laundry into the chute and that it was not inconsistent with her complaints to have suffered an injury that way. Regarding her carpal tunnel syndrome, Dr. Furr explained that the gradual repetitive activities of grasping, lifting, pushing, and pulling with her hands "would have probably precipitated the carpal tunnel." Dr. Furr further stated that the job description of a CNA was more likely than not to cause carpal tunnel as compared to the general population and that plaintiff was at an increased risk for contracting carpal tunnel syndrome. On cross-examination, Dr. Furr admitted that he did not note that plaintiff reported a specific incident of "dragging the laundry bag, opening the shoot, feeling a pop, [and] dropping it in."
44. The Full Commission gives greater weight to the opinions of Dr. Holthusen, plaintiff's treating physician, Dr. Burrows, and Dr. DuPuy than to those of Dr. Furr regarding the cause of plaintiff's carpal tunnel syndrome and neck problems.
45. Plaintiff did not present credible evidence that she was incapable of working between July 31, 2002 and May 5, 2003, or that she had a reduction in her wage earning capacity during this time. Plaintiff did not present credible evidence that she was incapable of working after May 5, 2003, that she has made reasonable efforts to find employment or that such efforts would be futile. Plaintiff testified that she applied for jobs after she quit her job at Fairway Home Care, but could not recall the names of prospective employers (except "Thru-way") or the dates of her applications.
46. Plaintiff failed to prove by the greater weight of the evidence that she suffered a compensable injury by accident or specific traumatic incident to her neck arising out of and in the course of her employment with defendant on or about January 24, 2002.
47. Plaintiff failed to prove by the greater weight of the evidence that her job duties caused or significantly contributed to the development of her bilateral carpal tunnel syndrome. Further, the greater weight of the evidence fails to show that plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome when compared to the general public.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain a compensable injury by accident or specific traumatic incident to her neck arising out of and in the course and scope of her employment with defendant on or about January 24, 2002. N.C. Gen. Stat. § 97-2(6).
2. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed her to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to or was a significant causal factor in the development of the disease. Rutledge v. Tultex Corp., supra; Hardin v. Motor Panels,Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000).
3. In the present case, plaintiff failed to prove by the greater weight of the evidence that her employment caused or was a significant contributing factor in her development of carpal tunnel syndrome, that the carpal tunnel syndrome was characteristic of or peculiar to her employment, or that she was at an increased risk of developing this condition due to her work. Hansel v. Sherman Textiles, 304 N.C. 33,283 S.E.2d 101 (1981).
4. Therefore, plaintiff did not contract an occupational disease, specifically, bilateral carpal tunnel syndrome, within the meaning of the law. N.C. Gen. Stat. § 97-53(13).
5. Defendant did not engage in prohibited ex parte communications with Wayne VonSeggen, PA-C. N.C. Gen. Stat. § 97-27, Salaam v. NC Dept. ofTransportation, 122 N.C. App. 83, 468 S.E.2d 536 (1996) (citations omitted).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall pay their own costs, except that defendant shall pay all expert witness fees previously approved.
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________________ THOMAS J. BOLCH COMMISSIONER
 S/_______________________ CHRISTOPHER SCOTT COMMISSIONER